Okay, counsel, we've combined these two arguments in 20-1107 and 20-1188 and the counselor advised that this is a little more difficult than the normal course of business because you can't get visual cues from us. So I'd ask you to listen carefully for when a judge starts to talk to ask a question and to stop what you're saying. You got that, Ms. Gelman? Yes, thank you. Mr. Dinser? I understand, Your Honor. Okay, Ms. Gelman, you're serving five, I understand. Yes, that's correct. Okay, why don't you go ahead and start your argument. Thank you. May it please the court. The two cases that are before the court today both concern the ATF final rule banning bump stock devices. That rule required everyone who has lawfully purchased a bump stock to either destroy the bump stock device or abandon it at an ATF office. Ms. Gelman, this is Judge Wallach. I have a question. Okay. Since we have some time, I'm going to just go through. On page 23 of the red brief, the government says the Supreme Court has never held that a statutory prohibition on dangerous personal property as opposed to real property. That's my insertion. Is that a correct statement? Your argument argues, and we couldn't find anything, that the Supreme Court has never held that a statutory prohibition on dangerous personal property as opposed to real property constitutes a taking. Is that correct? I don't know of any Supreme Court case that holds that a prohibition on dangerous personal property is a taking. This is a fairly novel situation. Okay. Page 13 to 14 of the blue brief, you say that the Supreme Court's early police power cases were made in the context of, I'm quoting you, a mere diminution of property values. How does that square with Samuels v. McCarty? Samuels v. McCarty is one of those early cases that the Supreme Court in Lucas v. South Carolina has indicated were a group of cases that expressed the court's view on why the state may diminish the value of property. These cases do not apply to cases where all the property values are diminished. There are circumstances to it that make it inapplicable to this case. In that case, the setting of that case was that there was the option for the plaintiff to register so that he could sell the remaining alcohol that was in his stocks under the few limitations and he had not registered. So I view this case as one of the instances of a forfeiture for a failure to comply with an existing regulation. But that's a more specific answer to your question, but I think that the general answer is that in Lucas v. South Carolina, Justice Scalia explained that these cases cannot be late 19th century and beginning of the 20th century. This is Judge Toronto. Can you just remind me, I don't mean to be petty, Justice Scalia was speaking for the court there, is that right, or was he speaking for less than the court? I believe he was speaking for the court. Okay, so the court said this, okay. Yes, so I think... On page 22 of the Blue Brief, you argued that the final rule, I'm quoting you, was not an exercise of police power because it was prompted by a change in policy, not by greater familiarity with bump stocks, and was obviously new legislation, not interpretation of statutory language. Didn't the shooting of all those people in Las Vegas not make the public and the government more familiar with bump stocks? I think... I want to answer your question as you asked it. Did the shooting in Las Vegas make the public more familiar with bump stocks? And the government. Certainly, yes, and the government. I believe it certainly did alert the public and the government to what a bump stock is capable of doing. I don't think that's the same as explaining, showing the government how a bump stock functions and whether the way a bump stock functions would be in, it would fall under the statutory language of what constitutes a machine gun. It can't, it wouldn't possibly have said anything about that. It certainly wasn't... Wait, I want to run through a bunch of questions, so let me do this and we can get on. On page 23 of the Blue Brief, you argued that the Venice line of cases is inapplicable because the question here is only whether the appellants had the right to possess their bump stocks when they acquired title to them. That is, whether they were legal. Your theory of the law, if the government had not given your client an opportunity to surrender or destroy their bump stocks, if the government had waited for the final rule to become effective and then seized their bump stocks as unlawful, would that still be a compensable taking? Yes, that would certainly still be a compensable taking. I think the point is that the public who owned bump stocks, when they purchased the bump stocks, the bump stocks were perfectly legal. So they acquired the entire bundle of property rights when they purchased those stocks, the right to possess, the right to use, the right to dispose, and it was... Wait, wait, wait. I want to keep your answers pretty short because I have a lot of questions. I'm sure the other judges... Okay. On page 24 of the Blue Brief, you argue that we should align our reasoning with a since-abrogated Ninth Circuit opinion that held that an assault weapons ban was not a compensable taking so long as reasonable use of the regulated property existed. Now, you'd agree with me that an automatic weapon is less accurate than a single shot, would you not? I think that's correct. What's a reasonable use for a fully automatic weapon, other than, say, area denial in combat? I think that what our brief refers to when it speaks of use of property would not be a taking. So, for instance, a regulation that restricted the sale of bump stocks would not be a taking. It would have been legitimate for the government to say, you can't sell these anymore. That wouldn't take away the entire bundle of rights. Therefore, it wouldn't be a taking. Ms. Gelman, my question was, what's a reasonable use for a fully automatic weapon? And while you're at it, what's your cyclical rate of fire? Is it 650 per minute? I believe it's in the triple digits, but I can't be more precise than that. But a reasonable use could be a sporting use. I don't feel I'm not in a position to say what the full range of reasonable uses are. I think that there Okay. I've fired a fully automatic weapon in combat. One doesn't fire more than a three-round burst. You'll burn out the barrel. On page 30, note 8 of the blue brief, you say the final rule required that owners of bump stocks not only destroy their bump stocks, but also dispose, dispossess themselves of any remaining scrap. Why was that, if you know? I don't know the answer to that. Okay. I'll ask the government that then. Let's see. I have a lot more, but I'll see to my brethren. Can I return you to the discussion of forfeiture kinds of matters, which as a factual kind of matter, may be what Amerisource and Acadia are about, and some of the older cases in which, as I understand it, a person can acquire title to property, real property, personal property, maybe both, at a time at which it was perfectly lawful to do so, but that later events can turn future possession into an illegality for which there is no compensable taking, such as, but not necessarily limited to, use even by somebody else in a criminal enterprise, perhaps also it becoming a nuisance. Why should this case not be like that? Your Honor, you're correct that those are cases in which the owners of the property had a property interest before the property was taken from them. But this is a very narrow line of cases in which the seizure was part of the government's administration of our justice system. So, for instance, in Acadia, a specific piece of property was seized as evidence in a criminal proceeding, used in the criminal justice procedure. In the Acadia case, property was seized because it was suspected of being in violation of U.S. law. In Tam Al-Amaz, property was seized because it belongs to a person who is suspected of using a specific piece of property for the purpose of the administration of the criminal justice system. You might even say that in exchange for the benefits of having a working system of justice, we have all implicitly agreed that the state has a right to temporarily take a piece of property that is needed to administer justice. That almost inheres in the title of the property that we receive the right to the state to take property from us if it's necessary to continue this justice system. Right. That way of putting it, and I'm particularly interested in trying to understand cases, this inhere in title notion, which has certainly played some role, at least in some of the older Supreme Court cases, like United States against Stoll and whatnot, seemingly having some relation to what at least used to be talked about as a background police power, when that phrase police power might have had a narrower meaning relating to health, safety, and morals than it has come to mean, and why this might not be an instance in which property was acquired when there were statutory prohibitions on machine guns, prohibitions that incorporated a certain measure of evolving implementation choices by the agency. The agency makes an implementation choice, and why should that not have the same effect as a title limitation being triggered as automatically, effectively transferring the title away from, and the Well, I'm going to think about that question for a moment. I think what Your Honor is saying is that the existence of the statute banning machine guns should serve as a background principle that inheres in the title to a bump stop. Is that, yes, I mean, I'm groping, so I'm not trying to be precise here, because I think this is an area in which there are a lot of concepts floating around, not very well organized, or related to each other, or precisely defined in a variety of case law at different levels, and so I'm trying to explore one strand here which may fit with, which doesn't include this idea of dormant limitations in hearing in title that spring to life upon certain events, and allow the destruction or dispossession, as a better general word, of property without that being a compensable taking. Your Honor, what the Lucas court said is that there would have to be a pre-existing limitation on the property, an independent pre-existing limitation on the property. Now, for the machine gun ban to serve as a limitation on the right of a owner of a bump stock, it would be strange that over the course of some ten years after bump stocks first began to be manufactured, the ATF issued letters assuring the public that bump stocks are not machine guns under the language of the statute. Now, certainly the ATF is exactly what it did in the case of the Aikens Accelerator. There's so much discussion of the Aikens Accelerator in Greece, but where the Aikens Accelerator was concerned, the agency issued an interpretive ruling designating the Aikens Accelerator after the fact as banned by the machine gun ban. The significance of the interpretive rule is that an interpretive rule is retrospective. I think we were talking about background principles, and I wanted to refer to some language in the Lucas decision. The Lucas court said that a background principle that adheres in the title to property has to do no more than what could have been achieved by the courts. I think it's very different in this instance. Before the final rule was issued, there was no court that could have taken the bump stocks away from the people who owned them. Why couldn't a court, if the ATF had not been in the definition of language in the statute, that bump stocks were in fact covered by the statute? Well, the ATF had issued letters for the 10 years prior to the final rule. Ms. Gilman, this is Judge Chen. Do those classification letters have the force and effect of law? No, they don't. I would look to what the DC Circuit has decided in the Gatiss case about the nature of the final rule being a legislative rule. What the DC Circuit did was analyze the language in the rule itself and the circumstances under which the rule was adopted to conclude that the agency intended this to be a rule that would have the force of law and would have prospective effects only. The language in the rule itself is very clear that bump stocks were not illegal before the final rule was passed, that it would have only prospective effect, and the rule itself speaks of Chevron deference, which is the standard that is applied to legislative rules. Does the rule say, besides invoking the Chevron framework, we are acting and defending and invoking Chevron Step 2, or does it ever say, we actually think that this statutory language is ambiguous, so Chevron Step 1 doesn't resolve the matter, we therefore have Chevron Step 2 authority, which we are exercising? It describes those steps of the Chevron treatment in detail. I'm sorry, is this in the final rule, or is this the DC Circuit opinion you're referring to? This is what the DC Circuit's discussion of what's in the final rule. I'm sorry, but I didn't quite hear an answer to my question, and I don't have the Federal Register materials with me. In the ATF's announcement of its rule, does it say the statute is ambiguous for Chevron purposes, and we are exercising our interpretive authority or implementation authority under Chevron Step 2. I can't find a place in the rule itself where the Chevron deference is discussed. Both steps of Chevron deference are discussed in the rule itself. This is part of why the DC Circuit concluded, as it did, that this was a legislative rule, in part because the rule itself invokes Chevron deference and discussed in depth both steps of the Chevron deference, but there were other reasons as well. I mean, it's the specific language of the rule denying that the ownership of bump stocks was illegal until the rule was passed, and the invocation of the agency's legislative authority under the statute. So, for a plethora of reasons, the DC Circuit concluded that this was unequivocally a legislative rule and not an interpretive rule, and the significance of that, of course, is that bump stocks were fully legal when everyone who owns one before the rule was passed under the law, under the statute banning machine guns, that statute did not reach bump stocks until the final rule was issued in its legislative capacity. That's tremendously significant for purposes of taking jurisprudence because it means that everyone who owned a bump stock had the full bundle of rights in their property, and it was only the final rule itself that took all of those rights away from the people who had to either destroy their property or abandon it at an ACF office. That's why in our brief we've spent so much time discussing the significance of the legislative rule and explaining the difference between the legislative rule with respect to bump stocks and the treatment of the Aikens accelerator because it, in part, explains the difference in the outcomes of these cases. Judge Chen, I'm trying to understand. I understand your pivot point between a so-called legislative rule and an interpretive rule, and I'm trying to think through why should that matter. The statute that banning machine guns authorizes the government to enforce and also interpret that statute to ensure that devices that can convert a weapon into a machine gun are likewise outlawed. So I guess I'm trying to understand. If that's all the government is doing, then the government was authorized in making that interpretation, whether you want to call it a legislative rule or an interpretive rule, and for purposes of this appeal, we have to assume that that regulation is, in fact, valid. Your Honor, I think that's absolutely right, and that would be a very important point if our lawsuit were challenging the validity of the rule, but it's not challenging the validity of the rule. Our lawsuit is only about whether this is a taking, about whether the owners of bump stocks had property rights that were protected that were taken by the final rule. And so for that purpose, I think the distinction between a legislative rule and an interpretive rule is highly significant, because under one scenario, the people who purchased bump stocks acquired property rights when they did so, and under the other scenario, they couldn't. Ms. Gelman? Yes. Can you hear me? Yes, I can. This is Judge Wallach. I have a couple more questions for you, and your time's running low. Okay. On page 18 of the red brief, it notes that in addressing a similar prohibition on bump stocks, the District Court of Maryland emphasized that the principle that the government may ban hazardous materials without compensation is, quote, consistent with the long history of state laws that criminalize, ban, or otherwise restrict items deemed hazardous under the police power, citing the regulation of machine guns, explosive devices, controlled substances, child pornography, fireworks, and lead-based paint. That's in Maryland's Shell issue versus Hogan. When the government criminalized the possession of child pornography quite a while ago now, did it have to, under your theory, pay compensation to the pornographers who possessed it before it was illegal? Well, there's a couple of aspects to that question. First of all, I don't know of any instance in which anyone did challenge us for taking any sort of limitation, criminalization of child pornography. I think this is a question that would have to be resolved by looking at the state laws, in effect, and common law, and whether this is regarded as a nuisance under common law, because that, of course, would be a background principle that would limit anyone's property rights in anything, including something that would be deemed child pornography. Would a machine gun be a nuisance? I think the government has admitted in its brief that bump stocks, they found no law to indicate that bump stocks are a nuisance. I don't think machine guns could be a nuisance either. Machine guns, of course, were grandfathered in to the ban on machine guns. Many of them are still legal and are owned by people, so that in itself, I think, suggests that it's not a nuisance. I don't think property itself is often a nuisance. I think it's ordinarily a use of property that's a nuisance. So my answer, I think... One last question, please. We've exceeded your time, but I'll let you keep your five minutes. Thank you. On page 13 of the green brief, the amici in support of the government say that RW Arms engaged in bump stock sales even after the ATF announced its plans to adopt the final rule, displaying a countdown clock on its website and sending promotional emails pointing to the impending ban. Is that correct? I believe it's correct that they did sell bump stocks before the rule was announced. I find that the amicus brief's discussion of this interesting because I think it points to something rather different than the amicus brief identifies. It suggests that... Ms. Gelman? Yes, I'm listening. Just tell me, did they display a countdown clock and send promotional emails? That was my question. Yes, I believe they did. Okay, thank you. And any other questions from the other judges for now?  Okay, then let's hear from the government. Thank you, Your Honor. This is Kenneth Benson. May it please the Court. I'd like to go directly to some of the answers that were given to Judge Tronto's and Judge Chen's questions about the bundle of rights. Because, Your Honor, there are no way that they could have gotten the full bundle of rights here that they claim. The plaintiffs never own the property rights that are at the basis of their takings claims. For the first, to start with, and this touches on what the Court asked counsel, they have no property interest in the ATF's letters. The letters offered a safe harbor, but they were described as ATF official positions, and counsel has acknowledged that they could change, and they could not have had a property interest in those. I'm sorry, I don't even understand. A property right in the letters, their property, the asserted property right is in possession of this equipment. Yes, Your Honor. They could not have had those. Let me frame it better, Your Honor, more clearly. Their property interests could not have been expanded or protected by those letters. Those letters were subject to change, as ATF said, and so those could not have created any of the sticks in the bundles of rights. Which meant that they could have been withdrawn at any time without there being a taking. And the withdrawal of those letters, two things happened. Those letters were withdrawn and then a new rule was put in place. But the withdrawal of those letters alone left the bump stocks subject to the always existing ban on machine guns. But Mr. Dinser, this is Judge Chen, I'm trying to understand what is the purpose of the letters? Because right now, the way you're characterizing them, they almost sound like a mirage that nobody should have relied on. And I was under the impression that the letters are something that these owners, these requesters for classification rulings are entitled to rely on them. I understand that you reserve the right to change your rulings on these matters. But nevertheless, if I were to receive a clearance letter from ATF and that the bump stocks are in fact legal and not outlawed by the statute, I think I could make an argument that now I've detrimentally relied on that classification letter that was reaffirmed over and over again for a decade. And only to have the rug pulled out from me a decade later. Respectfully, Your Honor, because those letters, not only did the ATF handbook say that the letters were subject to change. Do the letters precisely say, oh, and we hereby reserve the right to potentially change our view of this matter? Did it say something like that? The letters didn't, but in the National Firearms Handbook, where it authorizes the letters, it says, and I'm quoting here, Your Honor, classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulation. What are you just citing? Do you have a cite for what you just said? I do, Your Honor. That's the National Firearms Handbook that is used by ATF. That is the ATF's handbook. That is the basis of their saying we're willing to give these letters out. So they let people know. Then, of course, we had the example of Aikens. It did, in fact, change. All I'm saying is the fact that these letters could not have given them sticks in the bundles advice. They understood that they weren't going to be prosecuted, that ATF's take on it was that these weren't illegal, and if ATF had tried to prosecute them under the machine gun ban, these would have been, of course, thrown up and, of course, ATF or the DOJ or whoever tried to prosecute them would have lost. The withdrawal of these letters, that itself can't be taken under cases like Mitchell Arms. Those are just policy statements. So what you end up with is, and this gets to Judge Toronto's question about inerrance, what inerred into their ownership of these bump stocks was the ban on machine guns. That was done in 1986, preceded all of these bump stocks. What it means is that their bundle of rights, and they did have sticks in the bundle, but they were always subject to the prohibition of machine guns. Can you address how what you just said fits with the D.C. Circuit's reasoning, and was it Guiris is the name of the case, that said the new rule was legislative versus interpretive. I'm not sure that's the most significant thing in what the D.C. Circuit said. But it made a rather large point of saying it was really quite important that possession before the date of the rule not be declared illegal. Yes, Your Honor. So, I mean, there's a lot to your question, so I want to make sure I hit it all. They did make this determination about legislative versus interpretive. We disagree both with the plaintiff's citing of this as relevant to the analysis they're taking, or the analysis of the police power, and whether that can be brought into play. We don't think it has any relevance. And on top of that, we believe that this was properly deemed interpretive. Let's assume we're not going to disagree with the D.C. Circuit. Okay. But even if you don't disagree with the D.C. Circuit, what the D.C. Circuit did was it cited National Mine Association, which had this quote, those general descriptions do not describe tidy categories and are often of little help in particular cases. So the point being, this distinction, legislative versus interpretive, it's never been used in taking law. The point is it never cited a case that has used this distinction in any way. And we recommend, especially since it doesn't provide a nice, tidy distinction, that it not be transported over here where it really provides no use. Now, what the- Well, here, I guess, is another attempt, imprecisely, to try to express my worry. I think that there's rather a lot to this notion of a limitation in hearing and title. But that immediately raises the question whether the event that triggers the possessory illegality is an event that changes or merely applies a legal standard that inhered in title. And that makes me think that maybe it is rather important whether what ATF did here was legislative or interpretive or the like. And to say this has never been used in taking law, I will say, is simply not helpful to me at the moment in trying to figure out how to make conceptual sense out of this. So I'm really interested in help in making conceptual sense. Okay, and I think I can do that, Your Honor. Let's imagine for a second that ATF withdraws these letters and doesn't pass this rule. Okay? So what we have then is we have a prohibition, a statutory prohibition on machine guns. And so then we have the potential that ATF or DOJ or some federal officer arrests somebody for having a bump stock and says, this should fall under the machine gun statute. And the policy statements or the letters are no longer in existence. And they take this person into court and prosecute them. And what we have from the plaintiffs, and they admit on page 17 of the reply brief, that enforcing the law is not a taking. So putting aside the new rule, it would be okay under the plaintiff's acknowledgement if we withdrew the letter, which did not create a property interest, and we prosecuted these people without any notice. I mean, it wouldn't have been particularly fair. But we prosecuted these people without any notice. And we just prosecuted them under the statute. That couldn't be a taking because the statute has existed since 1986. That's enuring into this. So that is, when we talk about the bundle of sticks that they own, they don't own the bundle that protects them from being prosecuted under that statute. They could have, and so they could have been found guilty. All the rule did was interpret the statute and give people, to be fair, notice about how this interpretation was going to be applied. Do you think that the analysis that you just articulated would change if, in that prosecution, the court said that, as applied, this was void for vagueness? I'm sorry, as applied what? I missed the last word, Your Honor. As applied what? That the firearm statute by itself was void for vagueness, as applied? Or that because of inherent uncertainties, let's call them ambiguities, I'm not sure that matters, it would be interpreted by reference to the rule of lenity not to apply? I don't think it would matter, Your Honor, because the real question would be this. If the government started prosecuting people who owned bump stocks criminally, the value of those bump stocks would be presumably, I mean, if the government started these prosecutions, presumably the value would go close to or to zero. Well, unless the void for vagueness or rule of lenity rulings stuck, in which case the value would go right back up. I guess if that was ultimately adopted throughout the country, but I don't think so, Your Honor. I mean, ultimately, there's two ways that I think that that statute as written in yours, its interpretation can be limited, in which case its effect on their property rights could be limited. And in that sense, I guess I would have to acknowledge with the court that but whatever it was, they didn't have the full set of sticks in the bundle. They had something that was limited by the existing set. And we have to recognize that people who are buying bump stocks were buying them so that they could simulate machine guns. I mean, there's no other use for these things other than to get as close to a machine gun as you possibly can. The Aikens accelerator was already held to be illegal because it had a spring and tried to simulate a machine gun. And so the reality is that, I mean, interpreting these as that should not have been a stretch. So the new regulation, all that did was interpret and say that APS is going to interpret the automatic and the trigger function to include bump stocks. And that was an interpretive process. We believe that was an interpretive process. And do you have a, can you answer the question I think I asked counsel on the other side about whether ATF in its final rule, what exactly it said about Chevron step one and Chevron step two, and in particular, did it say the statute is ambiguous under Chevron step one, and therefore we are exercising authority under step two? My understanding is, your honor, is that it mentions Chevron. It does not indicate step two. And what it announces, and I'm quoting here, is the quote, best interpretation end quote of the statutory items. So that is based on a quick look, that's my understanding of what the regulation did. Okay, thanks. And in fact, the plaintiff's site, Gibson Wine, where the court offered this, it offered this statement. If you had an expression in a statute such as inter-urban railway, the query might come up as to what is an inter-urban railway. A particular agency may adopt a rule defining an inter-urban railway. That, in a sense, may be called an interpretive rule. And although the rule here did other things as well, the core of the rule here is they want a machine gun. And so with that, I'm going to move on to police power and talk about why the police power here, separate from the property interest issues, the police power deceits the plaintiff's takings claim. Can I just pose the following concern I have about that? So in Kelo, building on Midkiff and whatever Midkiff built on, I think the Supreme Court has said, we now understand the term police power to be essentially the same as public use, which is essentially the same as public purpose. If that's right, then what all nine justices in Kelo agreed with, which is that something that is an action that is a taking that is not for a public use is actually illegal whether or not compensation is paid. So how does this notion of police power, if it is essentially equivalent to public purpose, serve as a cabining of the government's authority to dispossess people of property without having to pay? I think the Bennett case and other Supreme Court cases have been clear that there's no question that Kelo describes the limitations that public use provides to the Fifth Amendment. But that case was not a case about the limitation of police power. It was a question of what happens if you have eminent domain and you don't have public use. As the Bennett case explained, eminent domain is only one way that the government can acquire or, in this case, order the destruction, but acquire individual, in that case it was a car, acquire individual's property. And if the property is being acquired not under eminent domain, but under police power, then the limits under eminent domain don't even apply. So talking about... Right. But that, I guess, is what is really puzzling me. Right. Dennis and I think the Lemaire source at Acadia are cases that are either about something in here's entitled or about forfeiture, customs cases, where, you know, there are background principles that make possession illegal. And if you're part of one of those background principles is, you know, seizing property for evidentiary purposes in a criminal proceeding, and that would be kind of a temporary one. The customs one is longstanding background kind of border control. What I am confused about is how it makes any sense as a constitutional matter to say the police power, which at the federal level is, you know, the exercise of the commerce power or some other delegated constitutionally delegated authority for the public good. How that doesn't... How one could say that whenever Congress or an authorized agent of Congress does something for that incredibly broad range of purposes, it doesn't have to pay for property as long as it doesn't say, we're not using the eminent domain power. Oh, that's right. It doesn't say we're using the eminent domain power. I think so. So if it was just the label, your honor, that would be tremendously problematic. I agree. So I think that there's two things. There's the question of public use. So it is the public. I mean, this... Right. But assume for these purposes that dispossession encompasses both seizure and transfer either to the government or to some private party or destruction. And I know the government keeps wanting to resist that, but just assume for the purposes, because I think that that's pretty much right under general matters. I think so. So there is that question, whether this was a physical taking or whether this was regulatory. But putting that aside, the next question is whether it's for destruction or if this case would be fundamentally different if the government demanded these bump stocks and then distributed them to the army, right? Then it would be for public use, as opposed to getting them off the street. There's a fundamental difference between those two things, which is recognized in the Horne case. And so that's the first question. And so what does Horne say about, you must destroy this versus you must give it to us? No, no. It says that it recognizes, it says, in acknowledging the variation in treatment between regulatory and physical taking, when the result might be the same, it says, a physical taking of raisins and a regulatory limit on production may have the same economic impact on... Right, but the difference between hand me your property and destroy your property is really that one of them is a physical taking and one of them is not? This court actually addressed that in Roseacre. And in that case, which mostly dealt with eggs, was also the question of whether the government wanted to test the chickens in the houses, whether they had salmon. This is that single passing sentence citing a case that wasn't actually about that? Is that what you're referring to? I don't believe so. I think this was an analysis by the court. The court said, and the plaintiff said, look, they're demanding our chickens so that they can kill them and test them for salmonella. And that's a physical taking. And what the Roseacre court said, what is clear is that had the regulations required Roseacre itself to kill and test the hen, no per se taking could be found. Right. That's the sentence I'm talking about. Yeah. And then it cites a case that doesn't support that sentence. So I'm not quite sure how much force to give to give to that, you know, facially hypothetical statement without a supporting case. Well, let me go deeper, Your Honor, on the distinction. We believe because the truth is, police power is used in a variety of areas. We believe that there are certain core police powers where there are, and I think Lucas, they don't use this term, but Lucas indicates that there are some things that there is a public benefit, even if it's incidental or, but these core police powers, which are the ability to outlaw something, the ability to protect borders. There's no economic benefit. It's not, you're not getting the benefit of, nobody's getting the financial benefit. When Mr. Kamelmaz's laptop was removed from him and ultimately broke in and the files corrupted, there was no other person who was saying, oh, now I've got this economic benefit. There was no transfer of that. That is at the core. When you start looking at core police powers, the one, so in our mind, the police power can be used in two ways, and considered in two ways. In the core police power items, it ends the analysis at that point. And in Kamelmaz, in questions about drugs, about bringing in goods that are forgery, those are core. And that just ends the analysis. In non-core areas where, as you said, it can come up, you can label anything police power in non-core areas, then it should drop down to a Penn Central analysis. And the character of the government taking and the investment backed expectations, these things will look at the police power and the nature of these. So help me to try to define this better, that there's some class of government compelled destruction orders or other possession is a crime pronouncements that you think do not constitute takings at all. Maybe I missed, I didn't hear it, but define this better for me. And this is the distinction that Venice came up with, where they said, basically, we're not, there's no eminent domain being used here, so we're not concerned. That if the thing, if there's no economic benefit to the government, if either in acquiring the goods or, for example, in the Lucas case, it was, you know, if you stop somebody from building anything on their property, we're going to assume that there's an economic benefit to the neighbors, to avoiding erosion, to all these things. If there's no economic, when ecstasy was banned, when lawn darts were banned, when child benefit to, you know, to an identified class, and you could come up with some hypothetical, but that wasn't the point of it. The point was not to create an economic effect. On the other hand, if you regulate somebody's apartment building so that people get to low income housing, the tenants get to stay there beyond what they, you know, in some sort of beyond what they were contractually allowed to. The situation in Sienega Garden, then that's, I mean, that comes from the Commerce Clause, but that's the kind of thing it needs to go to Penn Central analysis. And in fact, those acre, which even though it had potential of diseased eggs or the Yancey case, which had, you know, chickens or turkeys that were potentially diseased, those cases went to Penn Central analysis. So, and I'm not saying there's this wonderful bright line I can draw for the court, but what I can say is that the cases that are easiest are the cases and that what are core are the something's being banned. Something's being outlawed. It's not for the financial benefit of some group. It's to protect the health, the safety and the like of the citizenry. And that's why we have this police power that is separate from eminent domain. It has nothing to do with eminent domains. Mr. Dixon. So, yes, Your Honor. I have a few questions for you. I want to start with what I asked your Ms. Gelman. Why did the ATF require dispossession of remaining scrap? I don't know, but my interpretation of that has always been that they didn't want people taking things apart and keeping the pieces so that they could be put back together. And so that, I mean, unless you're going to... So destruction would be just taking it apart? I think that my interpretation has always been, and I would have to go back and check to see if they've defined these terms, is that they didn't want to get into a question of how it is sufficiently destroyed enough and the like. And by asking people to get rid of the scrap, that prevents them from keeping it one... Because under the definition of machine gun, you can't keep something sort of one step away from being a machine gun or machine gun part. That's also illegal. And so I took this to be to making sure that people weren't keeping this one step away from being a machine gun part or being a bump stock. On... I want to turn, and this is what piqued my interest, go to your discussion of police powers and the examples you gave. Let me give you a hypothetical. Suppose the FDA approved a drug for a particularly important medical use. And its patients are using it and it's keeping them alive. But some years later, the drug starts being used for a very dangerous recreational purpose. Could the FDA ban it entirely despite the continuing reliance of patients on the drug to keep them alive? If you're asking me... Obviously, I can't answer that from an FDA point of view, but let's assume that they can, that they have the legal authority to ban it. Then if your question is, would that result in a taking? That would not, Your Honor. Presumably, one of the responsibilities of the FDA is to say, you know, these drugs are safe and these drugs are not. And if they determine that a drug is not safe, then that falls within core... I mean, there's no financial benefit that somebody's going to get if it falls within core police powers. They ban it. It's not an eminent domain thing. And now, the contra, hypothetically... Mr. Dinser. What? Yeah, please, Your Honor. Is there any liability on the part of the government when those patients die? Under the... I'm not an expert in the Federal Tort Claim Act, but I would guess that there is not. I would guess that this would be the type of thing where a regulator has to make very difficult decisions about the health of the community and whether to authorize a drug or whether to ban it based on the big picture. But regardless of whether that liability exists, which I don't believe it does, the people who have it in their bathrooms and on their shelves or their stores, if it's banned for all purposes, then it would not be a taking. They would be obligated to flush it down the toilet or whatever. Ms. Gilman referenced that straight-up machine guns, an M250 caliber, can be possessed if there's a license. Okay. Am I correct that there's no licensing exception for bump stocks because they're all produced after 86? That is my understanding, Your Honor, yes, that they are all banned. I mean, the bump stocks that are defined in the statute, which are effectively all that I'm aware of, are banned and there's no licensing available. Okay, thank you. Go ahead. Turning to the one last comment about the police power that even if you end up saying it's not a core police power, it should always end up in a Penn Central analysis and not in a per se analysis because of the nature of the police power. And so the Lucas presumption does not apply here. Lucas was a case where it was because it was physical property, what the court held was for physical, for real property, I'm sorry, it was real property. For real property, if you ban it 100%, it has moved 100% of economic value, then we're going to assume that there's some economic benefit flowing to the government and or the public, and we're going to make that a per se taking. I think I may be just asking you the same question, that either this concept of core police power or this concept of economic benefit lying behind a government action to either of those concepts appear in Supreme Court case law? No, Your Honor, the concept of the core police power, basically going through these cases and trying to understand what the court is doing here, like in the Acadia case, you have the court recognizing that certain exercises of police power, quote, that they have repeatedly been treated as legitimate, even in the absence of compensation. So this court has recognized that there is this subset, this group of police power that is enough to even without compensation at all, you're done. And then with other assertions of police power, like as in Roseacre, you need to go to the Penn Central analysis. But no, Your Honor, this is how we try to square the variety of statements that we understand that the different courts have made about police power. And also just so that it corresponds with the efforts. I mean, in Keystone, the court describes sort of the underlying theory of police power and why it exists. And, and basically, it said that, along with the concept of the nearing, there's this sort of general concept that it nears to all properties that anybody owns, that it could be subject to the police power. And so some things like dangerous drugs and dangerous weapons and, and things that are being imported and the like, those have, I mean, the government's interest is much broader there and for health and safety reasons. And, and we believe that that, that focuses on a core police power. So just the last point on Lucas, this court has from time to time indicated that it, that Lucas may apply to personal property as opposed to just real property. This is the only circuit that has consistent with Lucas. And in the Horn decision, the recent Horn, it's the most recent time that we're aware that the federal circuit has said this is an A and D. The Horn decision, which came out after A and D, made it clear that Luke, that the limitations on Lucas are still good law, that it's only for real property with 100, economically worthless, that personal property that Luke, and I'm quoting Horn, quote, Lucas recognized that while an owner of personal property ought to be aware of the possibility that the new regulation might even render his property economically worthless. So that is the Supreme Court's most recent statement on this. And we believe, and the fourth circuit in Maryland shall issue reach the same conclusion is that for personal property, such as the bump stock, that, that there is no per se rule and that you have to, if they survive the police power, which we don't think they should. And if they have the property I'm sorry. And, and, and, and that's, that would be even for mandatory dispossession, dispossession as opposed to a use or sale restriction. Yes, you're on. Yes. That's that even if the government actually went in and took them, which we don't believe that they did, but if physically said, bring us your, your, your bump stocks, that, that they, that, that would that Lucas would not, would not prevent that from, would not require that from, from going to a per se analysis. And, but I mean, this was a regulatory action and, and it should be judged under Penn Central. And with that, unless the court has any other questions, we asked the court to affirm the holdings of both of the, the trial courts in Thank you. Thank you. Thank you all for your time and attention. Thank you. Ms. Gelman. Yes. I just would like to make a couple of points. The first is about the government's position that the letters didn't create any property rights for the owners of bump stocks. It was never our contention that the letters created a property right. The property rights came about simply by virtue of the purchase of a consumer product. There was no law in place. There was no reason why the owners of bump stocks wouldn't have the full bundle of rights in the bump stocks that they purchased. There was nothing in the machine gun ban that applied to the bundle of rights at that time. When the government speculates that it would have been possible to take someone to court and prosecute under the machine gun ban, that's pure speculation. And in fact, the legislative rule that the agency, that the ATF chose to bring about the final rule through a legislative rule is highly indicative that the agency itself understood that the machine gun ban standing on its own would not be sufficient in a court in order to prosecute someone for owning a bump stock. That's just beside the point that they wrote letters stating that they did not believe that it covered bump stocks. So the bundle of rights that we have that owners had in these bump stocks had nothing to do with the letters coming out. That's simply a confirmation of what the ATF's view was before they made a policy decision that bump stocks ought to be regulated by the machine gun ban. Now I want to point out something about the use of this in takings law. In fact, this is the very distinction that the Lucas court said is not permissible. The distinction between a regulation that results in some benefits and one that prevents some harm, these are just the same sides. They're two sides of a single coin. And the Lucas decision tells courts that that cannot be the determining factor in deciding how to deal with a categorical taking. The term core police powers, when it comes up at all, I Googled it on Westlaw, it's only with respect to what powers do the states have in comparison to what powers does the federal government have. And so you will see that expression at times in these early Supreme Court decisions that address takings law because the issue there was that it was a state regulation and it was largely a due process claim. But that's not a takings principle and there is no recognition of a core police power exempting government action from a takings analysis where all of the rights in property have been taken away. And there's nothing in it. I assume you disagree with the government's characterization of horn as reiterating the observation in Lucas about personal property insofar as the government says that horn applies that to dispossession as opposed to a regulation of use? I think the government is totally incorrect. The only thing that Lucas said is that unlike land where personal property is concerned, it might not be sufficient that the government has taken away all economic value. It's really just a reiteration of what the Supreme Court said in Andrus v Allard, where the owners of eagle feathers and other bird parts of protected birds could no longer be sold. Well, in that case, Supreme Court said you still have possession and this is therefore not a taking. It's reasonable regulation in that you are no longer able to sell. I think that the most you can say Lucas says and that horn reiterated is that if the owner of personal property has all rights taken away except the right to possession, that is likely a very difficult takings case. But that's not our case. In our case, possession was taken away. All rights were taken away. And I think that the words in horn that most indicate how this case should be decided is that the horn case said that whatever Lucas had to say about reasonable expectations with regard to regulation, and this is a quote, people still do not expect their property, real or personal, to be actually or taken away. Now, with the understanding that the Supreme Court has viewed your property being taken away, as your rights being destroyed in it, we take the point of view of the owner of the property, not the point of view of the government. The horn decision is saying, yes, you can expect reasonable regulations, reasonable restrictions on the use of your private property, and it might even mean you no longer have any economic use of your private property, but you'll get to keep it. And I think that my time is up. Thank you very much for hearing our argument today. Thank you. Thank you both, counsel. This matter will stand submitted.